( Not for publication)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                         :
KAREN SHAW,                              :
                                         :
                         Plaintiff,      :        Civil No. 05-4221 (RBK)
                                         :
        v.                               :        **OPINION**
                                         :
JO ANNE B. BARNHART,                     :
Commissioner of Social Security Administration, :
                                         :
                         Defendant.      :
_____:

**KUGLER**, United States District Judge:

        This matter comes before the Court upon appeal by Plaintiff Karen J. Shaw ("Shaw"),

pursuant to 42 U.S.C. § 405 (g), for review of a final determination of the Commissioner of

Social Security ("Commissioner") denying her application for Supplemental Security Income

("SSI").  For the reasons set forth below, the decision of the Commissioner will be upheld.

## I.  BACKGROUND

        Shaw, a forty-three year old woman, filed an application for SSI payments on January 9,

2002, alleging disability due to chronic hepatitis C, hypertension, gastroesophageal reflux disease

("GERD"), herniated discs in her neck, lower back pain, anxiety, migraine headaches, and kidney

stones. (Rec. 39.)  Shaw has a tenth grade education, (Rec. 284), and has no work history. (Rec.

285.)

1

**A.  Back Pain**

Following a motor vehicle accident in August 2000, Shaw complained of neck and back pain with "radiation to the left arm." (Rec. 182-83.)  After completing a physical examination, Dr. Marvin Wallach concluded Shaw had swelling on the left side of her neck. (Rec. 183.)  After the accident,  Dr. Allen Zechowy also examined Shaw and noted that she complained of pain in her neck, left shoulder, and left arm, as well as a feeling of numbness in the left arm. (Rec. 205.)  Dr. Zechowy reported that Shaw had tenderness in the cervical-nuchal region and pain in the left upper extremity with a component of numbness. (Rec. 206.)  He determined that Shaw's strength was full and symmetric and there were no abnormal movements, tremors, atrophy, or fasciculations. (Rec. 206.)  Dr. Zechowy recommended applying heat and engaging in a modified range of motion exercise program. (Rec. 206.)  He also prescribed 750 mg of Relafen to decrease inflamation, and Paxil for panic disorder. (Rec. 206.)

On November 6, 2001, Dr. Ricardo Eng conducted a Magnetic Resonance Imaging ("MRI") exam of Shaw's cervical spine.  The MRI showed a small right paracentral disc herniation at the C4-5 level, probable tiny right paracentral disc herniation at the C6-7 level, and a disc osteophyte complex causing mild spinal stenosis at the C5-6 level. (Rec. 207, 220.)  However, on February 18, 2002, an MRI of the lumbar spine showed no evidence of disc herniation and a mildly bulging annulus at the L5-S1 level. (Rec. 209.)  On March 5, 2002, Dr. Wallach diagnosed Shaw with two herniated disks at the C4-5 and C6-7 levels. (Rec. 164.)

**B.  Liver and Abdominal Conditions**

Shaw first tested positive for hepatitis C in 1993 while under the care of her treating physician, Dr. Wallach. (Rec. 118-19.)  In 2002, Dr. Wallach diagnosed Shaw with hepatitis C,

2

GERD and hypertension. (Rec. 166).  Dr. Wallach referred Shaw to Dr. Steven Liakos, a

gastroenterologist, for treatment of hepatitis C and GERD. (Rec. 203).  Dr. Liakos recommended

a work up for Shaw's hepatitis. With respect to her hypertension, Dr. Liakos told Shaw to either

go to the emergency room immediately or see a nephrologist because the problem seemed

refractory. (Rec. 203.)  Shaw did not return to Dr. Liakos for a recommended follow-up visit, and

the requested blood work was never performed. (Rec. 253-54.)

In 2002, Dr. Mintzer conducted a complete mental status examination of the claimant.

When asked about her symptoms related to hepatitis C, Shaw stated that she frequently had body

aches and occasionally ran fevers. (Rec. 227.)  She also reported that she gets ill at least four

times per week from hepatitis C. (Rec. 227.)  Regarding her GERD, Shaw said that her stomach

gets upset and acid comes up.  She added that she gets pain in her stomach, and these symptoms

occur about three times per week. (Rec. 227.)

In 2003, Dr. Steven Klein examined Shaw.  After a physical examination, Dr. Klein

diagnosed Shaw with GERD and hepatitis C. (Rec. 256-57.)[1]

In October 2003, during a mental health examination requested by the Commissioner,

Shaw reported to Dr. Grete Hesse that there was a time when she was receiving Interferon for

hepatitis C; however, the medication caused her to vomit and endure back pain, so she stopped

the treatment. (Rec. 263).

### C.  Hypertension

Dr. Wallach's notes indicate that Shaw has had problems with high blood pressure and

---

[1]  Dr. Klein also noted that Shaw had kidney stones six years prior to this examination.
(Rec. 256-57.)

hypertension dating back to 2000. (Rec. 188.)  On February 6, 2002, Dr. Steven Liakos examined

Shaw. Her blood pressure was recorded at 180/112 and, as mentioned above, he recommended

that Shaw either go to the emergency room or to a nephrologist to stabilize her blood pressure.

(Rec. 253.)

In July 2003, Dr. Schmidt also recommended that Shaw immediately go to the emergency

room in order to control her hypertension. (Rec. 269.)  Dr. Schmidt took Shaw's blood pressure

and recorded it at 200/118 and then, to ensure accuracy, he took a second reading, which

measured at 190/118. (Rec. 268.)

### D. Anxiety

Over the last eight years, Shaw has also been diagnosed with anxiety disorders. (Rec.

227.)  In an interview with Dr. Mintzer, Shaw described her symptoms during an anxiety attack.

She stated she would sweat, shake, get dizzy and feel like she was going to pass out. (Rec. 227.)

Dr. Mintzer diagnosed Shaw with panic disorder without agoraphobia. (Rec. 230.)  Dr. Mintzer

summarized his findings by stating that Shaw's limitations were moderate in degree (Rec. 230),

and she was able to understand and follow instructions if they were not too complex. (Rec. 230.)

In June 2002, Dr. R. Eckardt, Ph.D completed a psychiatric review technique form

("PRTF").  After reviewing medical evidence of Shaw's anxiety attacks, Dr. Eckardt concluded

that Shaw's impairments were not severe. (Rec. 239.)  Dr. Eckardt found that (1) Shaw's

restrictions of activities of daily living were mild; (2) she had no difficulties in maintaining social

function; (3) she had mild difficulties in maintaining concentration, persistence, or pace; and (4)

she had no recent episodes of decompensation. (Rec. 249.)  Dr. Eckardt also noted that Shaw had

no history of formal psychiatric treatment and that her general practitioner was the doctor who

prescribed her anxiety medication. (Rec. 251.)  Dr. Eckardt went on to state that although Shaw had occasional panic attacks, she was able to concentrate with "pace and persistence" and she was not significantly limited by her conditional impairment. (Rec. 251.)

On October 5, 2003, Dr. Grete Hesse evaluated Shaw and addressed her complaints of anxiety and panic attacks. (Rec. 262.)  Dr. Hesse diagnosed Shaw with panic disorder, largely without agoraphobia. (Rec. 266.)  She opined that Shaw's short term memory was fair, but her immediate and long-term memory were good and her intellectual functioning was within the low average range. (Rec. 264.)  In addition, she noted that Shaw demonstrated an appropriate affect and revealed no evidence of hallucinations or suicidal ideation. (Rec. 264.) Ultimately, however, Dr. Hesse concluded that Shaw's prognosis was poor because she had never worked and had no job training. (Rec. 265.)

Months later, on February 18, 2004, Shaw was hospitalized at the Berlin Hospital emergency room for anxiety. (Rec. 272).  Thereafter, in a November 5, 2004 report, Dr. Wallach once again diagnosed Shaw with panic attacks. (Rec. 274.)

**E.  Other Ailments**

Shaw's medical history also indicates other medical conditions including asthma (Rec. 255), hearing loss (Rec. 287), and three c-sections in 1978, 1980 and 1986.[2] (Rec. 121.)  The c-section which occurred in 1986 resulted in postpartum bleeding and endometritis. (Rec. 108.) Shaw also has a history of acute urinary tract infection (Rec. 119), and distal esophagitis. (Rec.

---

[2] The ALJ found that there was insufficient credible evidence in the record to corroborate or support any finding of significant functional limitations related to the hearing loss and/or asthma impairments. (Rec. 18.)  Furthermore, the hospitalizations due to the c-sections occurred many years prior to the relevant time period at issue here, and according to the record evidence, have not resulted in any long-term complications.

199.)

In May 2002, Dr. Mintzer diagnosed Shaw with migraine headaches. (Rec. 230.)  As a result of her neck pain, Shaw stated that she suffers from daily migraine headaches. (Rec. 263.)  In 2002, Shaw completed a headache questionnaire for the New Jersey Division of Disability Determination Services wherein she claimed (1) she had suffered from headaches for years, (2) the headaches usually lasted half a day or all day, (3) she experiences dizziness, nausea and vomiting during her headaches, and (4) the headaches are a constant limitation to her daily activities. (Rec. 90.)  She also stated that she has taken Tylenol 3 with codeine, Ibuprofen and Imitrex to alleviate the headache pain. (Rec. 90.)

### F.  Residual Functional Capacity Assessment

On October 21, 2003, Dr. R.T. Walsh, filled out a Residual Functional Capacity ("RFC") stating that Shaw could occasionally lift and/or carry up to fifty pounds, could frequently lift and/or carry up to twenty-five pounds, could stand and/or walk for a total of about six hours in an eight-hour workday, and could sit for a total of six hours in an eight-hour workday. (Rec. 232.)  Dr. Walsh determined that Shaw could frequently climb ramps and stairs and could occasionally climb ladders, ropes and scaffolding. (Rec. 233.)  Dr. Walsh also found that Shaw could frequently balance, stoop, kneel, crouch and crawl. (Rec. 233.)  Dr. Walsh reported that Shaw was unlimited in her ability to use her right hand, but had limited use of her left hand to reach in all directions, handle, and perform fine manipulation. (Rec. 234.)  Dr. Walsh issued a primary diagnosis of hepatitis C, hypertension, and GERD and a secondary diagnosis of herniated discs. (Rec. 231.)  Dr. Walsh stated that the treating/examining source's conclusions about Shaw's limitations were not significantly different from his findings. (Rec. 237.)

Although Dr. Walsh concluded that his findings were not different than the treating physicians' findings, Dr. Wallach subsequently completed a physical capacity evaluation on November 5, 2004 in which his conclusions were markedly different from Dr. Walsh's.  In particular, Dr. Wallach reported that Shaw could only sit for two hours, stand for one hour, and walk for one hour during an eight-hour work day. (Rec. 273.)  He also found that Shaw could occasionally lift up to twenty pounds and never lift more than 21 pounds. (Rec. 273.)  He concluded that Shaw could use both right and left hands for simple grasping and fine manipulating, but not for pushing and pulling. (Rec. 273.)  He also found that Shaw could not bend, squat, crawl, or climb and could occasionally reach above shoulder level (Rec. 273.)  Additionally, in an examination report with the same date (November 5, 2004), Dr. Wallach stated that these impairments would interfere with Shaw's ability to work full time for more than twelve months.[3]  (Rec. 275.)

**G.  ALJ McCafferty's Decision**

Shaw filed an initial application for Title XVI SSI on May 23, 1997. The application was denied at the initial level, and Shaw did not seek review.  Shaw filed the present application for SSI on January 9, 2002, alleging a disability onset date of March 1, 1997, which was again denied at the initial review level.  Shaw then filed a timely request for a hearing.  After holding a hearing on October 29, 2004, ALJ McCafferty issued a decision of denial dated December 20, 2004. On February 14, 2005, Shaw filed a request for review before the Appeals Council.  By

---

[3] Apparently, Dr. Wallach completed and submitted the Physical Capacity Evaluation and the Examination Report (both dated November 5, 2004) after the ALJ held a hearing on October 29, 2004.  Prior to these reports dated November 5, 2004, the most recent treatment note from Dr. Wallch in the record dates back to early 2002. (See Rec. 225.)

Order dated June 24, 2005, the Appeals Council denied claimant's request for review, at which point, the ALJ's decision of denial became the final decision of the Commissioner of Social Security ("Commissioner").

In her decision, the ALJ concluded that Shaw was not disabled at any time from January 9, 2002 through the date of her decision, December 20, 2004.[4]  After concluding that Shaw had not engaged in substantial gainful activity for the relevant period, ALJ McCafferty found that the medical evidence supported Shaw's assertions that she had "hepatitis, hypertension, spinal, anxiety and GERD impairments." (Rec. 19.)  However, after considering all of the evidence, the ALJ found that Shaw's impairments did not meet the severity of the requisite listing criteria. (Rec. 20.)

In assessing Shaw's RFC, ALJ McCafferty reviewed the medical record, as well as the testimony offered by Shaw and her friend, Reverend Golmitz.  The ALJ determined that although Shaw had valid impairments that may have resulted in the symptoms described by Shaw, she did not believe that Shaw's assertions regarding the severity of her impairments were completely credible when compared to the evidence as a whole. (Rec. 21.)  In light of these inconsistencies, the ALJ concluded that Shaw could perform the demands of a restricted range of light level exertional work, meaning that Shaw (1) is unable to perform postural activities with more than occasional regularity, (2) should avoid environments involving dangerous or hazardous

---

[4] ALJ McCafferty determined that the unfavorable decision relating to Shaw's 1997 application for SSI could not be reopened or revised because her current application for Title XVI payments was filed more than two years after the January 26, 1998 notice of the initial denial determination made with respect to Shaw's 1997 application. (Rec. 17.) Therefore, the relevant time period for purposes of the ALJ's disability determination ran from the date of the current application (January 9, 2002) through the date of the ALJ's decision (December 20, 2004).

machinery, (3) is able to perform simple, repetitive tasks, and (4) is unable to deal with more than occasional contact with the general public and co-workers. (Rec. 25.)

After drawing these conclusions, the ALJ noted that Shaw could not return to past work because she had no prior work history.  Therefore, the burden shifted to the Social Security Administration to show that jobs existed in the national economy which would be appropriate for Shaw. (Rec. 25.)  ALJ McCafferty posed a hypothetical to the vocational expert, Bruce Martin, to ascertain whether Shaw could perform an appropriate, available job.  Based on the ALJ's hypothetical, Martin concluded that Shaw could perform the duties of light commercial cleaning, packaging, or unskilled inspection work. (Rec. 302.)  After considering Martin's testimony, the ALJ concluded that Shaw was capable of "making an adjustment to work which exists in significant numbers in the national and regional economies." (Rec. 26.)

## II.  STANDARD OF REVIEW

District Court review of the Commissioner's final decision is limited to ascertaining wether the decision is supported by substantial evidence. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Morales v. Apfel, 225 F.3d 301, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 422 (3d Cir. 1999)).  If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360); see also Williams v. Sullivan, 970 F.3d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984) ("A district court may not weigh the

evidence or substitute its conclusions for those of the fact finder").

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham").  The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict. Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) (citing Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)). Furthermore, evidence is not substantial if "it constitutes not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." Wallace v. Sec'y of Health & Human Services, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

## III. DISCUSSION

The Commissioner conducts a five step inquiry to determine whether a claimant is disabled. 20 C.F.R. § 404.1530; Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  The Commissioner first evaluates whether the claimant is currently engaging in a "substantial gainful activity."  Such activity bars the receipt of benefits. 20 C.F.R. § 404.1520(a).  The Commissioner then ascertains whether the claimant is suffering from a severe impairment, meaning "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).

If the Commissioner finds that the claimant's condition is severe, the Commissioner

evaluates whether it meets or equals a listed impairment. 20 C.F.R. § 404.1520(d).  If the condition is equivalent to a listed impairment, the claimant is entitled to benefits; if not, the Commissioner continues on to step four to evaluate the claimant's RFC and determine whether the RFC would entitle the claimant to return to her "past relevant work." 20 C.F.R. § 404.1520(e).

The ability to return to past relevant work precludes a finding of disability.  Past relevant work is defined as work that the claimant has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for claimant to learn how to perform the work. 20 C.F.R. § 404.1560(b)(1).  If the Commissioner finds the claimant unable to resume past relevant work, the burden shifts to the Commissioner to demonstrate the claimant's capacity to perform work available "in significant numbers in the national economy." Jones, 364 F.3d at 503 (citing 20 C.F.R. § 404.1520(f)).  An ALJ is permitted to consult the opinion of a vocational expert in order to determine whether the claimant can perform his or her past relevant work or perform any type of work that is available in the national economy. 20 C.F.R. § 404.1560(b)(2).

Here, Shaw argues that the ALJ erred in (1) failing to adopt the opinion of Dr. Wallach, (2) failing to evaluate the opinions of other treating doctors, (3) determining that Shaw's condition does not satisfy the standard for disability set out in Social Security Ruling ("SSR") 85-15, (4) excluding evidence in calculating Shaw's RFC, and (5) posing a hypothetical to the vocational expert that did not include all of Shaw's disabilities. The Court will address these arguments in turn.

**A.  Weighing Opinion of Primary Physician**

One of Shaw's primary arguments is that the ALJ erred by failing to adopt Dr. Wallach's

11

opinion that the claimant is disabled.  Shaw claims that, according to the relevant regulations, Dr.

Wallach's opinion should be given great weight because he is her primary care physician.  See 20

C.F.R. §§ 416.927, 404.1527 (stating seven factors that the Commissioner must consider in

determining the weight given to medical opinions by the claimant's primary physician).  In

contrast, the Commissioner  argues that the ALJ's decision explains valid reasons for rejecting

Dr. Wallach's assessment of the severity of Shaw's impairments.

Although a treating physician's conclusion that a claimant is "disabled" is not dispositive,

when considering a claim for disability benefits, the ALJ generally affords greater weight to the

findings of treating physicians as opposed to the findings of doctors who have only evaluated the

claimant as a mere consultant. Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) (citing Mason

v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993); Wright v. Sullivan, 900 F.2d 675, 683 (3d Cir.

1990)).  Nevertheless, an ALJ can reject a treating physician's opinion outright based upon

contradictory medical evidence, and may afford a treating physician's opinion more or less

weight depending upon the extent to which that physician presents explanations to support his or

her opinion. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citing Newhouse v. Heckler,

753 F.2d 283, 286 (3d Cir. 1985)).  In other words, the Commissioner will give controlling

weight to a treating source's opinion on the severity of the claimant's impairments only when

that opinion is well-supported by "medically acceptable clinical and laboratory diagnostic

techniques and is *not inconsistent* with the other substantial evidence in [the] case record." 20

C.F.R. § 404.1527 (d)(2) (emphasis added).  When evaluating a treating physician's opinion

under these standards, the ALJ must explain what type of weight she has afforded to that treating

physician's opinion. 20 C.F.R. § 416.927(c)(2).

12

In concluding that Dr. Wallach's opinion should not be given controlling weight, the ALJ explained that the opinion was not well-supported and was inconsistent with other medical evidence in the record.  First, the ALJ noted that Dr. Wallach's assertions regarding Shaw's level of impairments relied almost exclusively on Shaw's subjective assertions and complaints. (Rec. 24.)  That is to say, Dr. Wallach did not provide any objective clinical, diagnostic or laboratory findings to support the degree of limitation that he opined. (Rec. 24). Second, the ALJ pointed out that Dr. Wallach's assessment was inconsistent with the claimant's MRI results, which showed only a mild to moderate degree of disc herniation. (Rec. 24, see Rec. 207, 220).  By contrast, Dr. Wallach's physical capacities evaluation form states that claimant's herniated discs caused severe limitations in movement sufficient to preclude claimant from performing any gainful employment. (Rec. 275.)  Third, the ALJ points out that there are no other medical findings in the record indicating the severity of impairment that Dr. Wallach found. (Rec. 24). Fourth, the ALJ explained that the claimant's self-reported activities of daily living suggest that she is more capable than Dr. Wallach's assessment suggests. (Rec. 24.)  In particular, the record revealed that Shaw stated she could manage her money, perform light housework, do puzzles, take public transportation, cook, attend church service, goes to the movies, take walks, and independently perform matters of self-care such as grooming and hygiene. (Rec. 79-80, 97-98, 101, 228, 290.)  Fifth, the record reveals that, during the relevant period for which Shaw claims disability, Dr. Wallach only examined Shaw in January, February and March 2002, and those visits were mostly for blood pressure checks. (Rec. 164-67).  The record shows no other visits with Dr. Wallach until November 2004. (Rec. 273).  In other words, Dr. Wallach did not examine or treat the claimant on a frequent or consistent basis in the relevant time period.

13

In sum, the ALJ gave a clear and detailed explanation as to why she did not afford controlling weight to Dr. Wallach's assessment and there is substantial evidence in the record to support that decision.  Dr. Wallach's conclusion regarding Shaw's capabilities does not rely upon any objective medical tests or findings for support, and the ALJ could not find any such supporting evidence in the record.  Moreover, both the claimant's MRI results and her self-reported activities tend to contradict Dr. Wallach's conclusion regarding the severity of claimant's back problems.  Therefore, because the ALJ explained that Dr. Wallach's opinion was not well-supported and actually contradicted other evidence in the record, the Court finds that the ALJ did not err in refusing to give his opinion controlling weight.

### B.  Weighing Opinions of Other Examining Physicians

In addition, Shaw also alleges that the ALJ did not appropriately weigh the opinions of other treating physicians.  In particular, Shaw claims that the ALJ violated her obligations under the regulations by failing to mention or consider the reports of Dr. Zechowy and Dr. Klein. (Pl. Mem. at 24-25.)

In making a disability determination, the Social Security Administration should "evaluate every medical opinion" contained in the record. 20 C.F.R. § 404.1527(d).  However, the ALJ does not have a duty to mention or specifically discuss every piece of evidence in the record, so long as the ALJ provides the reasonable basis for his or her decision. See Fargnoli v. Massanari, 247 F.3d 34, 42 (3d Cir. 2001).  In addition, after reviewing all of the medical evidence and reaching a conclusion on the claimant's request for benefits, the ALJ must "provide some explanation of why s/he has rejected probative evidence which would have suggested a contrary disposition." Cotter v. Harris, 650 F.2d 481, 482 (3d Cir. 1981); see Fargnoli, 247 F.3d at 42

14

("Where there is conflicting probative evidence in the record, we recognize a particularly acute

need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or

remand a case where such an explanation is not provided.").

      With respect to Dr. Zechowy's report, the ALJ did not err in failing to mention it because

the report is not conflicting, probative evidence.  First, the probative value of Dr. Zechowy's

report is relatively minimal because the report is based on a single examination of the claimant

that predates the period under adjudication.  See Henry v. Barnhart, 127 Fed Appx. 605, 607 (3d

Cir. 2005) (noting that the ALJ properly gave little weight to a doctor's report that was written in

a "conclusory fashion" and did not pertain to the relevant time period under adjudication).

Second, the findings in Dr. Zechowy's report do not contradict the ALJ's conclusion that

"although she [Shaw] is unable to perform the full range of light level exertional work, the

claimant is capable of making an adjustment to work which exists in significant numbers in the

national and regional economies." (Rec. 26.)  Specifically, in his report, Dr. Zechowy noted

Shaw's subjective complaints of neck pain and tenderness in her shoulder and neck area;

however, he also noted that (1) Shaw's gait was narrow-based and stable, (2) there were no

abnormal movements, tremors, atrophy, or fasciculation, and (3) Shaw performed well on tasks

of coordination and balance. (Rec. 205-206.)  Nowhere in his report did Dr. Zechowy opine

about Shaw's ability to perform work-related activities.  Moreover, the findings he did make are

consistent with the ALJ's findings that Shaw suffered from "cervical and lumbar disc disease"

that may have been severe, but not necessarily sufficient to meet the listing criteria for spinal

disorders or any other listed condition. (Rec. 17-18.)  Therefore, even though the ALJ did not

specifically discuss Dr. Zechowy's report, she did not disregard or ignore conflicting, probative

evidence in the process.

Similarly, Dr. Klein's report is not particularly probative on the issue of claimant's disability, and it likewise does not contradict the ALJ's determination that Shaw is not disabled. In his consultative report, Dr. Klein observed that Shaw had cervical spine strain and lumbosacral spine strain characterized by low back pain and some limited range of motion. (Rec. 256-57.) Dr. Klein then listed a series of other diagnoses that are seemingly based upon Shaw's representations to him because (1) there is no indication that his physical examination tested for, or led to, those diagnoses, and (2) some of his diagnoses are not supported by the record (i.e. his claim that Shaw had three herniated cervical discs and one herniated lumbar disc). Moreover, in accordance with Dr. Klein's observations regarding Shaw's back pain and range of motion, the ALJ's decision acknowledges that Shaw suffers from cervical and lumbar disc disease that results in some pain and limitations on Shaw's physical abilities. (See Rec. 18.) In other words, the ALJ actually agrees with Dr. Klein's observations. However, the ALJ goes on to note that the medical evidence on the whole did not support a finding that Shaw's impairments precluded her from performing all kinds of work, and in support of that conclusion, the ALJ cites specific evidence in the record that contradicts Shaw's subjective complaints of total disability. (Rec. 21-25.) By contrast, Dr. Klein's report does not make any conclusions regarding how Shaw's impairments might affect her ability to work. Therefore, the ALJ's findings regarding Shaw's back problems comport with Dr. Klein's observations of claimant's functional limitations such that the ALJ's conclusion that Shaw was not disabled does not contradict or disregard any documented finding or medically supported opinion in Dr. Klein's report. Simply put, the ALJ was under no duty to specifically mention Dr. Klein's report because it does not constitute

probative, contradictory evidence. See Walker v. Comm'r of Soc. Sec., 61 Fed. Appx. 787, 788-89 (3d Cir. 2003) (noting that an ALJ has no duty to specifically discuss evidence that is not probative of and conflicting with the ALJ's findings); Brubaker v. Barnhart, No. 05-76, 2005 WL 3557925, at *3 (E.D. Pa. Dec. 29, 2005) ("[A]n ALJ is not required to discuss every piece of evidence in the record.").  Accordingly, the Court finds that the ALJ properly weighed the medical opinions in the record and did not err by failing to specifically refer to the reports of Dr. Klein or Dr. Zechowy.

### C. Residual Functional Capacity Determination

With respect to step four in the analysis, Shaw alleges that the ALJ's RFC analysis did not "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." (Pl. Mem. at 26.)  In determining the RFC, the ALJ must base her assessment on relevant evidence such as medical history, laboratory findings, effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, and effects of symptoms. S.S.R. 96-8P (1996).

Here, the ALJ appropriately weighed all of the medical evidence in the record to find that Shaw had the residual functional capacity to perform "a restricted range of light level exertional work." (Rec. 5.)  As alluded to above, the ALJ explained that although Shaw could perform work which "requires maximum lifting of twenty pounds and frequent lifting of ten pounds," she was "unable to perform postural activities with more than occasional regularity; should avoid environments involving dangerous or hazardous machinery; is able to perform simple, repetitive tasks; and is unable to deal with more than occasional contact with the general public and coworkers." (Rec. 25.)  In reaching these conclusions, the ALJ first performed a comprehensive

examination of the medical record wherein she contrasted the claimed level of disability with the

medical evidence in the record, including specific analysis of (1) the claimant's testimony, (2) the

results of a November 6, 2001 cervical MRI, (3) records of claimant's emergency room visits, (4)

the report of Dr. Mario Magaisic, (5) the lack of any record of current treatment by a primary care

provider, (6) evidence that Shaw had been non-compliant in taking prescribed medication, (7) the

examination report of Dr. Mintzer, and (7) Shaw's Global Assessment of Functioning scores.

(Rec. 22-23.)  Based on this analysis, the ALJ found that the medical record failed to corroborate

the "frequency or severity of symptomologies to the degree alleged by the claimant." (Rec. 23.)

Then, the ALJ specifically analyzed the medical opinions in the record that contained specific

findings as to Shaw's functional limitations.  In particular, the ALJ specifically discussed the

opinions of Dr. Hesse, Dr. Wallach, Dr. Alemick, Dr. Walsh, and Dr. W.L. Flock. (Rec. 23-25.)

Only after analyzing these medical opinions in light of the other evidence in the record, including

evidence presented at the hearing, did the ALJ ultimately determine that Shaw was able to

perform light level exertional work with the foregoing additional restrictions.  In other words, the

Commissioner's decision demonstrates that the ALJ carefully weighed the totality of the

evidence in determining Shaw's RFC.  Accordingly, the Court finds that the ALJ's analysis at

step four is supported by substantial evidence and does not require a reversal or remand for

further explanation.

### D.  Claimant's Psychological Limitations

Shaw also argues that even if the Court found that her physical disabilities were not

disabling, her psychological limitations would prevent her from being able to work.  Like

physical impairments, a psychological disorder is not necessarily disabling unless there is a

18

showing of related functional loss. See Meton on Behalf of Meton v. Sec'y of Health & Human Services, 737 F. Supp. 867, 870 n.3 (E.D. Pa. 1990) (citing Sitar v. Schweiker, 671 F.2d 19, 20 (1st Cir. 1982)).

In the present matter, there is substantial evidence in the record to support the ALJ's findings as to Shaw's psychological impairments and their effect on her ability to perform work. As a preliminary matter, the ALJ recognized that Shaw suffered from anxiety. (Rec. 18, 19.) However, the ALJ also explained that the record did not document "specific symptoms or functional limitations of the necessary character" to support a finding of disability based upon claimant's anxiety problems. (Rec. 19.)  With regard to Shaw's capacity to perform activities of daily living, the records containing Shaw's self-reported activities tend to belie any claim to severe psychological impairment as Shaw had consistently reported that she is largely independent in matters of self care, performs light housework, cooks, does puzzles, watches television, takes walks on occasion, goes to church, shops, has a driver's license, and can take public transportation. (Rec. 79-80, 97-98, 101, 228, 284, 290.)  Moreover, Shaw's records indicate that she has not had any consistent psychiatric treatment on either an in-patient or out-patient basis. (Rec. 228, 263.)

In addition, the medical reports of Dr. Mintzer, Dr. Hesse, and Dr. Flock demonstrate that Shaw's psychological impairments did not rise to the level of a disability in the relevant time period.  Dr. Mintzer's mental status examination of May 31, 2002 noted that Shaw was oriented to person, place and time and was acting in a manner appropriate to the situation. (Rec. 229).  He also stated that Shaw's abstract thinking was fair, and although her general knowledge was poor, her concentration was fair as well. (Rec. 229).  Dr. Mintzer diagnosed Shaw with panic disorder

without agoraphobia and summarized his findings by stating that Shaw was able to "comprehend and follow instructions, as long as they do not become too complex." (Rec. 230.)  Likewise, Dr. Hesse reported that although Shaw's short term memory was limited, her long-term and intermediate memory were good; she was not confused; she was able to manage her own money; she had no hallucinations or suicidal tendencies; and her intellectual functioning was within the low average range. (Rec. 264-65.)  In addition, the opinion of Dr. Flock, a state agency psychologist, concluded that Shaw had no more than mild limitations in all spheres of mental functioning. (Rec. 249-51.)  On the basis of this evidence, as well as evidence received by the AlJ through the hearing level, the ALJ concluded that Shaw was "able to perform simple, repetitive tasks; and is unable to deal with more than occasional contact with the general public and coworkers" (Rec. 25).  Because the ALJ's decision explains that the record fails to establish a disabling psychological impairment, the Court finds that the ALJ's decision adequately addresses Shaw's mental impairments, and further, that there is substantial evidence to support the ALJ's conclusions regarding Shaw's non-exertional capabilities.

### E.  Validity of Hypothetical to Vocational Expert

As a final point of contention, Shaw argues that the ALJ did not include all of Shaw's impairments in the hypothetical posed to Bruce Martin, the vocational expert at the administrative hearing.  Specifically, Shaw alleges that the hypothetical posed to Martin failed to take into account the claimant's (1) limited range of motion, (2) chronic neck, back and left arm pain, (3) limitations with standing, walking, sitting, climbing, stooping, bending, lifting and squatting, (4) low average intellectual function, (5) high levels of generalized anxiety with frequent panic attacks, (6) headaches, and (7) aches from hepatitis C. (Pl. Mem. at 30.)

20

Therefore, Shaw contends that it was error for the ALJ to rely upon the vocational expert's statement that the claimant could "work as a commercial cleaner at the light exertional level . . . work in packaging . . . and work in unskilled inspection." (Rec. 302.)

The relevant regulations provide that, during an administrative hearing, the ALJ is permitted to pose hypothetical questions to a vocational expert to determine whether an individual with the claimant's medical impairments can perform past work or other available work in the national economy. See 20 C.F.R. § 404.1560 (b)(2).  However, "the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments." Podedworny v. Harris, 745 F.2d 310, 281 (3d Cir. 1984) (citing Tennant v. Schweiker, 682 F.2d 707, 711 (8th Cir. 1982)).  To be accurate, the hypothetical does not need to include every impairment that the claimant alleges, but rather, the hypothetical question must reflect all of the claimant's impairments that are supported by the medical record. Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); Podedworny, 745 F.2d at 218; Wallace v. Sec'y of Health & Human Services, 722 F.2d 1150, 1155 (3d Cir. 1983)).

In explaining this standard, the Third Circuit has noted that "objections to the adequacy of hypothetical questions posed to a vocational expert often boil down to attacks on the RFC assessment itself." Rutherford, 399 F.3d at 554 n.8.  In particular, the Court explained,

> [A] claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations

> during the RFC assessment and so did not convey those limitations to the
> vocational expert.  Challenges of the latter variety . . . are really best understood
> as challenges to the RFC assessment itself.

Id.  In the present matter, the hypothetical that the ALJ posed to the vocational expert is almost a

verbatim recitation of the ALJ's RFC assessment.  Both the ALJ's RFC assessment and the

hypothetical posed to the vocational expert refer to Shaw's age, education, and lack of work

experience and contain the following functional capabilities: (1) the ability to perform light level

exertional work, (2) the ability to perform only occasional postural activities, (3) the need to

avoid dangerous or hazardous machinery, and (4) the ability to perform simple, repetitive tasks

with no more than occasional contact with the public and co-workers. (See Rec. 25, 301-302.)

Therefore, because the ALJ conveyed to the vocational expert the same limitations that the ALJ

identified in her RFC assessment, the claimant's challenge to the ALJ's hypothetical is best

construed as a challenge to the RFC assessment itself. See id.

   As discussed above, the ALJ's RFC determination is supported by substantial evidence.

Initially, the ALJ specifically noted Shaw's cervical back problems, hepatitis C, allegations of

pain, postural limitations, hypertension, and mental impairments, including anxiety. (See Rec.

18.)  However, the ALJ then performed a thorough analysis of the medical record in which she

determined that a comparison of the subjective allegations and the objective medical evidence

revealed that claimant's assertions regarding the intensity, persistence and limiting effects of her

impairments were not fully credible. (Rec. 20-23.)  In summary, the ALJ explained that,

> Medical sources have failed to note signs of significant focal or neurological
> deficits, diminished ranges of motion, muscle atrophy or weakness, motor
> disruption, or sensory or reflex abnormalities to the degree as asserted by the
> claimant, and the medical record reveals no notable evidence of physical
> compromise which would affect the claimant's ability to lift, carry, stand, walk,

etc. to the degree as alleged.  The medical evidence reveals no evidence of any
end organ damage.  Treating medical sources have failed to document specific
claimant actions or medical events indicating or suggesting marked or extreme
psychological restrictions concerning the claimant's ability to perform activities of
daily living, to sustain social functioning, or to maintain concentration or focus of
attention. . . .

(Rec. 23.)  In light of this analysis, the ALJ reasonably discounted many of the limitations

alleged by the claimant, and instead, based her RFC determination on the claimant's limitations

that were established by credible, medical evidence, including but not limited to the claimant's

test results and the opinions and observations of Dr. Alemick, Dr. Walsh, Dr. Mintzer, Dr. Hesse,

and Dr. Flock. (See Rec. 22-25.)  In other words, substantial evidence supports the ALJ's RFC

determination, and by extension, also supports the ALJ's hypothetical to the vocational expert

which reiterated that RFC assessment. Covone v. Comm'r Soc. Sec., 142 Fed. Appx. 585, *587-

88 (3d Cir. 2005) ("Because the hypothetical posed to the vocational expert reflected claimant's

RFC, and that RFC is supported by substantial evidence, we affirm the ALJ's determination that

claimant is not disabled."); Dumas v. Schweiker, 712 F.2d 1545, 1553-54 (2d Cir. 1983) (finding

that the vocational expert's testimony was valid where there was "substantial record evidence to

support the assumption upon which the vocational expert based his opinion").  Thus, based upon

the medical evidence cited by the ALJ in making her RFC assessment, as well as the ALJ's

credibility determination as to Shaw's testimony, the Court concludes that the hypothetical posed

by the ALJ to the vocational expert accurately reflected Shaw's limitations. See Izzo v. Comm'r

Soc. Sec., 2006 WL 1749434, at *6-7 (3d Cir. June 27, 2006) (finding that a hypothetical

question posed to a vocational expert was proper where the ALJ described only those limitations

that comported with the medical evidence and the ALJ's credibility determination as to the

claimant's testimony); <u>McGonigal v. Barnhart</u>, 153 Fed. Appx. 60, *62 (3d Cir. 2005) ("Because only those limitations found by the ALJ to be supported by the record need to have been included, the ALJ's hypothetical question was proper.") (internal citations omitted).

## IV.  CONCLUSION

Based on the foregoing analysis, the Court finds that the Commissioner's decision is supported by substantial evidence, and therefore, will be affirmed. The accompanying Order shall issue today.

Dated:   8-22-06                                          s/ Robert B. Kugler
                                                         ROBERT B. KUGLER
                                                         United States District Judge